UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| IN RE APPLICATION OF REPUBLIC OF KAZAKHSTAN FOR ORDER DIRECTING DISCOVERY FROM ARTUR LUNGU PURSUANT TO 28 U.S.C. § 1782 | Misc. Action No. _____ |

### *EX PARTE* PETITION FOR DISCOVERY IN AID OF FOREIGN PROCEEDINGS PURSUANT TO 28 U.S.C. § 1782

Pursuant to 28 U.S.C. § 1782, the Republic of Kazakhstan ("Kazakhstan" or "Petitioner") respectfully submits this petition for an order permitting it to issue subpoenas to Artur Lungu ("Lungu" or "Respondent") for discovery that will assist Petitioner in pending foreign legal proceedings. Attached hereto are: a proposed order, a proposed form of a subpoena *ad testificandum* (Exhibit A), a subpoena *duces tecum* (Exhibit B) and the supporting Declaration of Matthew H. Kirtland (Exhibit C). Upon service of the proposed subpoenas, Mr. Lungu will be able to assert any objections available to him under Federal Rule of Civil Procedure 45, and thus his rights will be fully protected.[1]

### REASONS FOR GRANTING THE PETITION

**I.     PETITIONER'S PURPOSE FOR SEEKING § 1782 DISCOVERY**

1.      Mr. Lungu resides in this judicial district at 51 Lakeside Cove, Spring, Texas 77380-1679. Kirtland Decl. ¶ 3.

---

[1] The Court's standard Order for Conference and Disclosure of Interested Parties should not be issued, as this is a proceeding ancillary to a proceeding in another court. *See* Fed. R. Civ. P. 26(a)(1)(B), 26(f).

1

2. Petitioner requires the requested discovery in connection with foreign legal proceedings that are currently pending in the courts of Belgium, Luxembourg, the Netherlands, and Italy (the "Foreign Proceedings"). *Id.* ¶¶ 4, 7.

A. **THE SCC ARBITRATION – THE STATI PARTIES' FRAUD**

3. The Foreign Proceedings arise out of a prior international arbitration that Anatolie Stati, Gabriel Stati, Ascom Group, S.A. ("Ascom"), and Terra Raf Trans Traiding Ltd. (collectively "the Stati Parties") commenced against Petitioner before the Arbitration Institute of the Stockholm Chamber of Commerce (the "SCC Arbitration"). *Id.* ¶ 7. Mr. Lungu, as detailed below, played a key role in the financial operations of the Stati Parties at all relevant times.

4. In the SCC Arbitration, the Stati Parties demanded compensation for alleged expropriation of certain assets in Kazakhstan. *Id.* ¶ 8. One of the assets for which the Stati Parties sought compensation was a liquefied petroleum gas plant (the "LPG Plant"). *Id.*

5. On December 19, 2013, an award was issued in the SCC Arbitration in favor of the Stati Parties, and against Petitioner (the "SCC Award"). *Id.* ¶ 9. As part of the SCC Award, the Tribunal, as a result of various representations by the Stati Parties, awarded $199 million to the Stati Parties in compensation for the LPG Plant. *Id.*

6. The Stati Parties have initiated court proceedings against Petitioner to enforce the SCC Award in multiple jurisdictions, including the above-referenced Foreign Proceedings pending in Belgium, Luxembourg, the Netherlands, and Italy. *Id.* ¶ 10. In these Foreign Proceedings, Kazakhstan contends *inter alia* that the Stati Parties procured the SCC Award by fraud and that the SCC Award is therefore unenforceable. *Id.* For example, Kazakhstan contends that (a) the Stati Parties used a number of schemes to fraudulently inflate the construction costs of the LPG Plant, including through multiple related-party transactions with a sham company called Perkwood Investment Limited ("Perkwood"); (b) throughout the SCC Arbitration, the

2

Stati Parties fraudulently claimed that they had invested over $245 million in the LPG Plant using fabricated evidence; (c) the Stati Parties communicated the fraudulently inflated LPG construction costs to their auditor and thereby obtained falsified financial statements, which they also relied upon in the SCC Arbitration; (d) before the SCC Arbitration commenced, the Stati Parties used the falsified financial statements to procure an indicative bid from the Kazakh state-owned company KazMunaiGas ("KMG") for the LPG Plant in the amount of $199 million; and (e) the Stati Parties used this fraudulently obtained KMG indicative bid in the SCC Arbitration to obtain the SCC Award, which included $199 million in compensation for the LPG Plant. *Id.*

7. The above-referenced details concerning the alleged Stati Parties' fraud is non-exclusive. Petitioner has continued to uncover new frauds of the Stati Parties during the pendency of above-referenced Foreign Proceedings, including a fraud concerning a financial transaction known as the "Laren Transaction," which is further described below.

    **B.    ENGLISH LEGAL PROCEEDINGS – PETITIONER PROVES THE SCC AWARD WAS OBTAINED BY FRAUD – STATI PARTIES ABANDON PROCEEDINGS**

8. One of the first jurisdictions in which the Stati Parties attempted to enforce the fraudulently obtained SCC Award was London, England. *Id.* ¶ 11. The Stati Parties instituted proceedings there in the High Court of Justice (the "English High Court") in early 2014 (the "London Proceedings"). *Id.*

9. In late 2016/early 2017, after the Stati Parties' fraud came to light, Kazakhstan submitted evidence to the English High Court to substantiate its allegation that the SCC Award was obtained by fraud. *Id.* In February 2017, the English High Court held a two-day hearing in which it carefully considered Kazakhstan's evidence. *Id.* By order dated June 7, 2017, the English High Court found that Kazakhstan had presented a *prima facie* case that the Stati Parties obtained the SCC Award by fraud. *Id.* The English High Court further found that Kazakhstan's

3

fraud allegations needed to be examined at trial and decided on their merits, and set a trial date of October 31, 2018. *Id.*

10. Thereafter, the Stati Parties did two things. First, in an effort to forum shop, they initiated a series of new enforcement cases in different European countries, without telling any of the new courts about the English High Court's fraud decision. *Id.* ¶ 12. These are the above-referenced Foreign Proceedings. The Stati Parties started these proceedings in August 2017. *Id.*

11. Second, on February 28, 2018, the Stati Parties unexpectedly filed a notice seeking to voluntarily discontinue the London Proceedings. *Id.* ¶ 13. Over the objections of Petitioner, the Stati Parties were allowed to discontinue their case, but on the condition that the Stati Parties pay Petitioner's legal fees and costs and not institute any further proceedings in England to enforce the SCC Award. *Id.* By abandoning the London Proceedings, the Stati Parties escaped final judgment in the English High Court on their fraud. *Id.*

12. However, as set forth below, the Stati Parties' fraud is a live issue in the ongoing Foreign Proceedings in Belgium, Luxembourg, the Netherlands and Italy.

### C. THE PROCEEDINGS IN BELGIUM

13. On September 29, 2017, the Stati Parties filed an *ex parte* application for permission to make a pre-judgment attachment (in the form of a preliminary garnishment) against Kazakhstan before the Attachment Judge of the Dutch Language Court of First Instance in Brussels (the "Brussels Court"). *Id.* ¶ 14. Specifically, the Stati Parties requested permission to proceed to a conservatory garnishment against Kazakhstan, including on the National Fund of Kazakhstan ("National Fund") held by the Bank of New York SA/NV ("BNY Mellon"). *Id.*

14. On October 11, 2017, the Brussels Court issued the *ex parte* garnishment order requested by the Stati Parties. *Id.* ¶ 15.

4

15. On October 13, 2017, the Stati Parties served the garnishment order on BNY Mellon. *Id.* ¶ 16.

16. In late October 2017, in response to the garnishment order, BNY Mellon issued an undated declaration stating that it had frozen National Fund cash and securities accounts in the amount of approximately $22 billion (including $589 million in cash). *Id.* ¶ 17.

17. On November 13, 2017, the Stati Parties also filed an *ex parte* application with the French Language Court of First Instance in Brussels for an exequatur order to enforce the SCC Award. *Id.* ¶ 18.

18. On November 20, 2017, Kazakhstan filed an application to set aside the October 11, 2017 pre-judgment garnishment order. *Id.* ¶ 19.

19. On December 11, 2017, the French Language Court of First Instance in Brussels granted the Stati Parties' exequatur order *ex parte*, stating that Kazakhstan was free to file an opposition to the order. *Id.* ¶ 20. Thereafter, Kazakhstan filed an application to set aside the exequatur order on February 2, 2018, and a preliminary procedural hearing was held on Kazakhstan's application on March 13, 2018. *Id.* Kazakhstan contends, in these set-aside proceedings, that the SCC Award is unenforceable and therefore should not be granted exequatur because the Stati Parties procured the SCC Award by fraud. *Id.*

20. On April 27, 2018, a hearing was held on the merits of Kazakhstan's application to set aside the pre-judgment garnishment order. *Id.* ¶ 21.

21. On May 25, 2018, the Brussels Court issued a judgment that confirmed the pre-judgment garnishment but limited it to the amount of the Stati Parties' claim on the SCC Award, which was quantified as $530 million in total. *Id.* ¶ 22. BNY Mellon then released the

garnishment except as to $530 million in cash, which is being kept frozen pending the resolution of the ongoing proceedings, including in respect of Petitioner's opposition to exequatur. *Id.*

22. The hearing on Kazakhstan's application to set aside the *ex parte* exequatur order obtained by the Stati Parties is scheduled to be held on 9-10 May 2019. *Id.* ¶ 23. As set forth above, Kazakhstan contends in these proceedings that the SCC Award is unenforceable and therefore should not be granted exequatur because the Stati Parties procured the SCC Award by fraud.

23. The discovery requested in this petition will assist Petitioner in the legal proceedings pending in Belgium. *Id.* ¶ 24.

### D. THE PROCEEDINGS IN LUXEMBOURG

24. On August 16, 2017, in proceedings initiated by the Stati Parties, the Luxembourg bailiff served attachments freezing certain receivables due to Kazakhstan from Luxembourg-based entities, including the entity Eurasian Resources Group S.a.r.l. *Id.* ¶ 25.

25. On August 24, 2017, the Stati Parties filed an *ex parte* request for exequatur of the SCC Award with the President of the Luxembourg District Tribunal. *Id.* ¶ 26. On August 30, 2017, the Tribunal issued the exequatur order *ex parte*. *Id.*

26. Subsequently, the Stati Parties served the exequatur order on Kazakhstan. *Id.* ¶ 27.

27. On November 2, 2017, Kazakhstan filed an appeal of the exequatur order. *Id.* ¶ 28.

28. The parties are now engaging in briefing on the Stati Parties' application for exequatur on a schedule set by the Luxembourg court. *Id.* ¶ 29. Kazakhstan is contending in these proceedings that the SCC Award is unenforceable and therefore should not be granted exequatur because (among other reasons) the Stati Parties procured the SCC Award by fraud. *Id.* A hearing on this issue is expected to be scheduled for the end of 2019/beginning of 2020. *Id.*

29. The discovery requested in this petition will assist Petitioner in the legal proceedings pending in Luxembourg. *Id*. ¶ 30.

    **E.    THE PROCEEDINGS IN THE NETHERLANDS**

30. On August 31, 2017, the Stati Parties filed an *ex parte* application in the Court of Summary Proceedings of Amsterdam (the "Dutch Court") for permission to make a pre-judgment attachment (in the form of a preliminary garnishment) against Kazakhstan. *Id.* ¶ 31. Specifically, the Stati Parties requested permission to proceed to a pre-judgment attachment against assets held by BNY Mellon for Kazakhstan or as part of the National Fund, and shares held by the Samruk-Kazyna JSC ("Samruk") in KMG Kashagan B.V. ("KMGK"). *Id.* The Stati Parties claimed that a pre-judgment attachment against Samruk should be possible due to an alleged unity of identity between Kazakhstan and Samruk. *Id.*

31. On September 8, 2017, the Dutch Court *ex parte* issued the attachment order requested by the Stati Parties, subject to the condition that the Stati Parties initiate proceedings to obtain an exequatur order within a specified period of time. *Id.* ¶ 32.

32. On September 14, 2017, the Stati Parties served *ex parte* the attachment order on the assets held by BNY Mellon with a value of $22 billion and shares held by Samruk in KMGK, which are valued in excess of $5 billion. *Id.* ¶ 33.

33. On September 26, 2017, the Stati Parties filed an application with the Amsterdam Court of Appeal (the "Dutch Court of Appeal") for an exequatur order to enforce the SCC Award against Kazakhstan and Samruk (the "Exequatur Proceedings"). *Id.* ¶ 34.

34. Following the Stati Parties' attachment on September 14, 2017, BNY Mellon issued a garnishment declaration on October, 12, 2017. *Id.* ¶ 35. In this declaration, BNY Mellon declared that the attachment did not have any effect because – briefly put – there is no legal relationship between BNY Mellon and Kazakhstan. *Id.* Thereafter, the Stati Parties insisted with

BNY Mellon by letters dated October 18 and 19, 2017, that BNY Mellon change its declaration. *Id.* On November 1, 2017, BNY Mellon changed its declaration and froze the bank and securities accounts of the National Fund with a value of $22 billion because of what BNY Mellon stated were "*uncertainties.*" *Id.* In December 2017, the National Bank of Kazakhstan filed an application for interim proceedings to lift the attachments on its bank and securities accounts. *Id.*

35. On January 23, 2018, the Dutch Court granted the National Bank of Kazakhstan's application to have the attachments lifted, based on two separate grounds. *Id.* ¶ 36. First, the Dutch Court lifted the attachment because the bank accounts at BNY Mellon did not belong to Kazakhstan (the purported debtor of the Stati Parties), but to the National Bank of Kazakhstan. *Id.* Second, the Dutch Court lifted the attachment because the Stati Parties failed to disclose, in spite of their duty under Dutch law to be truthful with the court, that they had unsuccessfully attempted to levy attachments against these same bank accounts in 2014. *Id.*

36. On February 20, 2018, the Stati Parties filed a notice of appeal declaring that they were going to appeal the January 23, 2018 judgment of the Dutch Court. *Id.* ¶ 37. However, on June 5, 2018, shortly before the Stati Parties were due to submit their statement of appeal, the Stati Parties applied to the Dutch Court of Appeal to strike their case from the court docket. *Id.*

37. The National Bank of Kazakhstan has now initiated damages proceedings against the Stati Parties for an amount of approximately $118 million based on the unlawful attachment of assets of the National Bank of Kazakhstan. *Id.* ¶ 38.

38. On November 8, 2017, Samruk filed an application for interim proceedings to set aside the pre-judgment attachment order (the "Samruk Attachment Proceedings"). *Id.* ¶ 39. On

December 5, 2017, a hearing was held before the Dutch Court on the merits of Samruk's application to set aside the pre-judgment attachment order. *Id.*[2]

39. On December 7, 2017, the Stati Parties issued main proceedings against Samruk before the Amsterdam District Court to obtain a declaration in law that there is unity of identity between Kazakhstan and Samruk. *Id.* ¶ 40.

40. On June 15, 2018, Kazakhstan and Samruk each submitted statements of defense. *Id.* ¶ 41. On the same date, the National Bank of Kazakhstan submitted a statement of defense as an interested party. *Id.*

41. On June 22, 2018, a hearing was held in the Exequatur Proceedings. *Id.* ¶ 42. Therein, Kazakhstan is contending that the SCC Award is unenforceable and therefore should not be granted exequatur because the Stati Parties procured the SCC Award by fraud. *Id.*

42. On July 31, 2018, Kazakhstan filed its appeal brief with the Dutch Court of Appeal in the Attachment Proceeding. *Id.* ¶ 43. The Stati Parties filed their statement of defense on September 11, 2018. *Id.*

43. On November 6, 2018, the Dutch Court of Appeal issued a decision in the Exequatur Proceedings, in which it *inter alia* granted Kazakhstan the opportunity to further substantiate its fraud claim following disclosures of further documents by the Stati Parties. *Id.* ¶ 44. The decision means that the Dutch Court of Appeal will not render a judgment on the Stati Parties' application to enforce the SCC Award without an in-depth examination of all evidence relevant to Kazakhstan's claim that the award was obtained by the Stati Parties' fraud. *Id.* In this respect, the Dutch Court of Appeal set a February 5, 2019 date for Kazakhstan to make further

---

[2] The court denied Samruk's application on January 5, 2018, and Samruk appealed this denial on February 2, 2018. *Id.* ¶ 39 n.1. On April 10, 2018, Kazakhstan filed an application to join the appeal, which was granted on June 5, 2018. *Id.*

written submissions on its fraud claim, and ordered that an oral hearing would take place thereafter. *Id.*

44. The discovery requested in this petition will assist Petitioner in the legal proceedings pending in the Netherlands. *Id.* ¶ 45.

### F. PROCEEDINGS IN ITALY

45. On January 29, 2018, by means of Presidential Decree No. 1287/2018 (the "Decree"), the Court of Appeal of Rome granted the Stati Parties' *ex parte* application under Article 839 ICCP and declared the SCC Award "recognized" in Italy. *Id.* ¶ 46.

46. On May 14, 2018, Kazakhstan exercised their right to challenge this *ex parte* recognition order by commencing proceedings before the Court of Appeal of Rome. *Id.* ¶ 47. Therein, Kazakhstan contends that the SCC Award is unenforceable and should not be recognized because, *inter alia*, the Stati Parties procured it by fraud. *Id.* In particular, Kazakhstan contends that recognition of the SCC Award in Italy is contrary to Italian public policy since it (i) was the result of a fraudulent scheme and (ii) was based on false information and evidence provided by the Stati Parties to the Arbitral Tribunal. *Id.*

47. On October 17, 2018, the Stati Parties filed their statement of defense to Kazakhstan's application. *Id.* ¶ 48. A hearing took place on November 7, 2018, during which the court ordered additional briefing. *Id.* Further hearings and proceedings are therefore pending in this case. *Id.*

48. The discovery requested in this petition will assist Petitioner in the legal proceedings pending in Italy. *Id.* ¶ 49.

### G. INFORMATION IN THE POSSESSION, CUSTODY, AND CONTROL OF MR. LUNGU

49. Mr. Lungu played a key role in the financial operations of the Stati Parties. *Id.* ¶ 50. This is confirmed in a written witness statement that Mr. Lungu submitted in the SCC Arbitration. Specifically, in his written witness statement:

   a. Mr. Lungu testified that he joined Ascom – a company at the top of the Stati Parties' structure of companies – in February 2004, and that he joined Tristan Oil Ltd. ("Tristan") – another high-level Stati company – in November 2006. *Id.* ¶ 50(a).

   b. Mr. Lungu testified that he was Executive Vice President and the Chief Financial Officer of Ascom and Tristan at all relevant times. *Id.* ¶ 50(b).

   c. Mr. Lungu testified that, in these roles, he was responsible for all financial management activities relating to the programs and operations of Ascom and Tristan. He also testified that he was intimately familiar with the history, operations, holdings, contracts, finances and corporate structure of Ascom and three other relevant Stati companies – Terra Raf Trans Traiding Ltd., Kazpolmunay LLP ("KPM") and Tolkynneftegaz ("TNG"). *Id.* ¶ 50(c).

   d. Mr. Lungu testified to having detailed knowledge concerning the finances of the Stati Parties in Kazakhstan, including the LPG Plant at the center of one of the Stati Parties' frauds. *Id.* ¶ 50(d).

50. The Stati Parties, to fund their investments in Kazakhstan (including the LPG Plant), raised money from investors (including U.S. investors). *Id.* ¶ 51. Specifically, the Stati Parties, acting through companies that they controlled—Tristan, KPM and TNG—entered into

an Indenture with Wells Fargo Bank, National Association ("Wells Fargo"). *Id.* ¶ 52 & Attachment 1 thereto. Wells Fargo served as the trustee. *Id.* ¶ 52 & Attachment 1 thereto. KPM and TNG served as guarantors of Tristan's obligations under the Indenture. *Id.* ¶ 52 & Attachment 1 thereto. Artur Lungu, in his position of Chief Financial Officer of Tristan from 2006 until at least 2014, played a key role in the fundraising efforts of the Stati Parties. *Id.* ¶¶ 52, 58 & Attachments 1-5, 8-9.

51. Pursuant to the Indenture and its amendments, on December 20, 2006 and June 7, 2007, Tristan sold notes ("Existing Notes") to multiple investors (the "Existing Noteholders") totaling $420,000,000. *Id.* ¶ 53.

52. Also pursuant to the Indenture and its amendments, on June 19, 2009, Tristan issued additional notes with a nominal value of $111,110,000 ("New Notes") to Laren Holdings Ltd. ("Laren"). *Id.* ¶ 54. Laren paid only $30,000,000 for the New Notes, thereby securing a discount of approximately 73% on their face value. *Id.*

53. The funds which were used to purchase the New Notes originated from a credit facility in the amount of $60,000,000, extended from seven lenders to Laren with an interest rate of 35% per annum (the "Laren Loan"). *Id.* ¶ 55. The seven lenders were Avelade Holdings Ltd ($7,000,000); GLG Atlas Macro Fund ($14,500,000); GLG Atlas Value & Recovery Fund ($16,500,000); Renaissance Securities (Cyprus) Limited ($2,300,000); Vision Advisors III Ltd ($13,700,000); Alder Shipping Ltd ($1,000,000); and Sputnik Group Ltd ($5,000,000) (collectively "Lenders").[3] *Id.*

54. The New Notes, representing $111,110,000 aggregate principal, were then issued to Avelade Holdings Ltd ("Avelade") ($12,963,000); GLG Atlas Macro Fund ($25,926,000); Renaissance Securities (Cyprus) Limited (two notes collectively valued at 37,592,000); Vision

---

[3] Alder Shipping Ltd. apparently did not receive New Notes. *Id.* ¶ 55 n.2.

Advisors III Ltd ($25,370,000); and Sputnik Group Ltd ("Sputnik Group") ($9,259,000) (collectively, "New Noteholders"). *Id.* ¶ 56 & Attachment 6 thereto. Three of these New Noteholders—Renaissance Securities (Cyprus) Limited, Sputnik Group, and Avelade—are affiliated with Renaissance Capital. *Id.*

55. The Laren Loan and issuance of the New Notes are together referred to herein as the "Laren Transaction." Anatolie Stati negotiated key terms of the Laren Transaction. *Id.* ¶ 57. Mr. Lungu was Tristan's Executive Vice President and Chief Financial Officer during the Laren Transaction, and was a key participant in the transaction. *Id.* ¶ 57 & Attachments 4-5 thereto.

56. On December 17, 2012, the Stati Parties and Tristan, on the one side, and certain of the Existing and New Noteholders, on the other side, entered into a so-called "Sharing Agreement and Assignment of Rights" (the "Sharing Agreement"). *Id.* ¶ 58 & Attachment 7 thereto. Under the Sharing Agreement, any amounts collected by the Stati Parties on the SCC Award are to be paid on an account administered by a security agent. *Id.* ¶ 58 & Attachment 7 thereto. The Sharing Agreement provides for a mechanism of the distribution of the proceeds paid into the account among the Stati Parties and the Noteholders. *Id.* ¶ 58 & Attachment 7 thereto. Artur Lungu served Tristan at the executive level well after the Sharing Agreement was executed – until at least 2014. *Id.* ¶ 59 & Attachments 8-9 thereto.

57. Because of Mr. Lungu's key role in the financial operations of the Stati Parties at all relevant times, he is in position to have highly relevant information concerning the fraud of the Stati Parties, which information in turn is highly relevant to the above-referenced foreign legal proceedings. The information in Mr. Lungu's possession, custody and control (both testimony and documents) is expected to include *inter alia* information concerning: the Stati Parties business activities in and relating to Kazakhstan; the LPG Plant; Perkwood and other

13

companies used by the Stati Parties to effectuate the fraud; the issuance of the Existing and New Notes to fund the Stati Parties' investments in Kazakhstan; the Laren Transaction; the Stati Parties' financial statements; and the Stati Parties' attempt to enforce the fraudulently obtained SCC Award.

58. In addition to taking Mr. Lungu's deposition, Petitioner seeks to have Mr. Lungu produce any non-privileged documents in his possession, custody or control relating to the Stati Parties' activities in Kazakhstan, including but not limited to the following:

    a. documents related to the LPG Plant;

    b. documents relating to the companies through which the Stati Parties engaged in activities in Kazakhstan – including but not limited to Perkwood, Azalia, KPM, TNG, and Tristan;

    c. communications with any representatives or persons working on behalf of the Stati Parties, to the extent such communications relate to the Stati Parties' activities in Kazakhstan;

    d. communications with any representatives or persons working on behalf of any entities controlled by the Stati Parties (such as Tristan, KPM, TNG, and Perkwood), to the extent such communications relate to the Stati Parties' activities in Kazakhstan;

    e. communications with any representatives or persons working on behalf of the Republic of Kazakhstan, to the extent such communications relate to the Stati Parties' activities in Kazakhstan;

    f. communications with any representatives or persons working on behalf of a state agency of the Republic of Kazakhstan, including not limited to

KazMunaiGas, the General Prosecutor's Office and subdivisions thereof, the Ministry of Oil and Gas (Ministry of Energy and Mineral Resources), the Mangystau Court, and the Presidential Administration, to the extent such communications relate to the Stati Parties' activities in Kazakhstan;

g. documents related to the New Notes or Existing Notes, including all communications with Existing Noteholders and New Noteholders;

h. documents relating to Laren, the Laren Loan, and the Laren Transaction, including communications with the Stati Parties, Tristan, KPM, TNG, Wells Fargo, Renaissance Capital, the Laren Lenders, Linklaters LLP, the New Noteholders, and Harney Westwood & Riegels LP, and any documents related to litigation concerning the Laren Transaction;

i. documents reflecting the Stati Parties' attempts to enforce the SCC Award, including the funding for the same; and

j. documents relating to any fraud or allegations of fraud committed by the Stati Parties and any entities controlled by the Stati Parties, including but not limited to Tristan, KPM, TNG, and Perkwood.

## II. THE REQUIREMENTS OF SECTION 1782 ARE SATISFIED

59. To authorize discovery under 28 U.S.C. § 1782, three requirements must be met: (1) the application must be made by an interested party or upon application of a foreign or international tribunal; (2) the party from whom discovery is sought must "reside" or be "found" in the jurisdiction of the district court where the § 1782 petition has been filed; and (3) the document or testimony must be for "use" in a foreign or international tribunal. All three requirements are met here.

60. First, Petitioner is an "interested party" because it was a party to the SCC Arbitration and is a party to the proceedings pending in the courts of Belgium, Luxembourg, the Netherlands, and Italy. Kirtland Decl. ¶ 7.

61. Second, Mr. Lungu resides in this jurisdiction at 51 Lakeside Cove, Spring, Texas 77380-1679. *Id.* ¶ 3.

62. Third, the information sought by Petitioner is "for use" in the proceedings pending in the courts of Belgium, Luxembourg, the Netherlands, and Italy. *Id.* ¶ 4. Specifically, the requested information will be used by Petitioner to support its contentions in these foreign proceedings that the SCC Award is unenforceable, including for the reason that the SCC Award was procured by the fraud of the Stati Parties. *Id.*

### III. THE *INTEL* FACTORS WEIGH IN FAVOR OF GRANTING THE PETITION

63. The Supreme Court has identified four discretionary factors that a district court must consider when ruling on a § 1782 application: (1) whether the person from whom discovery is sought is a participant in the foreign proceeding; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court judicial assistance; (3) whether the § 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether discovery would be unduly intrusive or burdensome. *Intel Corp. v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264-65 (2004). Here, all four *Intel* factors weigh in favor of granting the Petition.

64. First, Mr. Lungu is not a participant in the proceedings pending in the courts of Belgium, Luxembourg, the Netherlands, and Italy. Kirtland Decl. ¶ 5. *Cf. Intel*, 542 U.S. at 264 ("[W]hen the person from whom discovery is sought is a participant in the foreign proceeding

. . . , the need for § 1782(a) aid generally is not as apparent as it ordinarily is when evidence is sought from a nonparticipant in the matter arising abroad.").

65. Second, there is no indication, or reason to believe, that the courts of Belgium, Luxembourg, the Netherlands, or Italy would be unreceptive to judicial assistance by § 1782 discovery. Kirtland Decl. ¶ 6.

66. Third, this request is not sought to, and does not have the effect of, circumventing any foreign proof-gathering restrictions or other policies. *Id.*

67. Lastly, this request is not unduly burdensome or intrusive. It seeks categories of information that are clearly defined and that are readily in the possession, custody and control of Mr. Lungu. *Id.* ¶ 5. For Mr. Lungu to testify about these issues, and produce any responsive, non-privileged documents in his possession, custody or control, will not create any undue burden or be overly intrusive.

68. The *Intel* factors thus weigh in favor of granting the Petition.

## CONCLUSION

WHEREFORE, because the Petition complies with the requirements of 28 U.S.C. § 1782, and the discretionary factors weigh in favor of it being granted, Petitioner respectfully moves the Court to issue the attached order granting the Petition, authorizing the issuance of the subpoenas in the form attached hereto as Exhibit A and Exhibit B,[4] and authorizing Petitioner to issue additional subpoenas for the production of documents and/or depositions of Mr. Lungu as is reasonably necessary and consistent with the Federal Rules of Civil Procedure.

---

[4] The dates on the subpoenas attached hereto as Exhibits A and B correspond to the date of the filing of this Petition. Kazakhstan will adjust those dates based on the service date of the subpoenas.

Dated: February 7, 2019

Respectfully submitted,

*/s/ C. Mark Baker*
C. Mark Baker
State Bar No. 01566010
S.D. Tex. Bar No. 993
mark.baker@nortonrosefulbright.com
Fulbright Tower
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246

Attorney-in-Charge for Petitioner Republic of Kazakhstan

OF COUNSEL

NORTON ROSE FULBRIGHT US LLP
Matthew H. Kirtland (*pro hac vice* forthcoming)
D.C. Bar No. 456006
Maryland Bar No. 9712170120
matthew.kirtland@nortonrosefulbright.com
799 9th Street NW, Suite 1000
Washington, D.C. 20001
Tel.: (202) 662-0200
Fax.: (202) 662-4642

NORTON ROSE FULBRIGHT US LLP
Kevin O'Gorman
State Bar No. 00788139
S.D. Tex. Bar No. 18043
kevin.ogorman@nortonrosefulbright.com
Denton Nichols
State Bar No. 24079056
S.D. Tex. Bar. No. 2078406
denton.nichols@nortonrosefulbright.com
Fulbright Tower
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone: (713) 651-5151
Facsimile: (713) 651-5246